In the Matter of BENJAMIN J. LOEWY, Petitioner, against BINGHAMTON HOUSING AUTHORITY, Respondent.

Third Department, November 20, 1957.

*James B. Gitlitz* for petitioner.
*Donald F. McManus* for respondent.

GIBSON, J. This proceeding is brought under article 78 of the Civil Practice Act to review the determination of the Binghamton Housing Authority removing petitioner from his position as housing project manager.

The respondent Authority was created by chapter 53 of the Laws of 1946 (subsequently re-enacted, in substance, as § 425 of the Public Housing Law) for the purposes specified in article XVIII of the Constitution of the State of New York. Respondent's powers and duties are those prescribed by the Public Housing Law for municipal housing authorities generally. It maintains two housing projects in the city of Binghamton, that involved in this proceeding being known as Saratoga Terrace, which, at the time of the hearing, contained 166 rental units occupied by 700 to 800 persons.

Petitioner was appointed housing project manager of Saratoga Terrace on April 24, 1950. He was suspended on March 1, 1957 and subsequently dismissed as of that date by determination of the Authority rendered after a hearing.

The duties of petitioner's position were to be determined by the Authority. (Public Housing Law, § 32, subd. 1.) By subdivision 2 of the section cited, the Authority was also empowered to delegate to one or more of its employees such powers or duties as it might deem proper. There appears to have been at no time any official action by the Authority, or none of record at least, to define the duties or responsibilities of petitioner's position.

Petitioner was found guilty of eight of the charges preferred against him. The first two charges are clearly the crucial ones and seem to have been so considered by the Authority. The first specified that on February 5, 1957, petitioner rented an apartment to Mr. and Mrs. Macko, contrary to the instructions of his superior that such apartment be rented to one of a previously selected list of tenants. The second charged a similar unauthorized rental on February 8, 1957 to Mr. and Mrs. Hunt. The issue as to petitioner's authority had to be resolved upon the flatly contradictory testimony of the Authority chairman and that of petitioner. The Authority did so by accepting the chairman's testimony and since we find it substantial evidence we may not disturb the findings of guilt predicated upon it. We will, however, return to these findings upon our consideration of the penalty imposed.

The third charge found proven was that petitioner, without authority, purchased a tractor at a cost of $510.37, and the fourth charge, also held to be established, was that, in seeking

approval by the State Division of Housing of such purchase, he falsely represented in a letter to the division that the Authority had approved it. There was evidence, which does not appear to be seriously controverted, that at the time of this transaction the tractor and equipment in use for snow removal had broken down and had been reported as beyond economical repair; that, with the knowledge of the Authority chairman, who had noted that snow was not being properly removed, petitioner and a representative of the division inspected the tractor-snow plow subsequently ordered; that such representative dictated the letter in question, which employed the word "recommended" and not "approved", as charged, and which petitioner signed; that a letter from the division approving the purchase was received by the chairman at her home before the purchase was effected. The chairman denied petitioner's testimony that she approved, by telephone, the purchase of the tractor but, so far as appears, she did not, on receipt of the letter from the division or on witnessing the delivery of the equipment, forbid it or take any other action, despite the claimed emergency nature of the transaction. There was uncontradicted evidence that other purchases by petitioner in excess of the limitation of $25 said to be in effect had been approved. In this case, petitioner placed the matter on the agenda for approval by the Authority at its next meeting, but such meeting was that at which petitioner was suspended and action on the purchase was thereupon deferred, although the tractor had been in constant service. The Authority's determination that petitioner was guilty of these two charges was upon substantial evidence and must be sustained. It seems doubtful that disciplinary measures would have been taken, however, had the controversy concerning the apartment rentals not arisen but, in any event, the circumstances of the transaction and the past course of conduct seem to us such as to inhibit the imposition of a severe penalty.

The four additional charges found to have been established were proven by substantial evidence but were of such minor nature as to approach the trivial. One charged petitioner with failing to report satisfactorily as to a water drainage problem and another with failing to obey a direction that the tenants be advised of the fiscal operations of the Authority by statements to be indorsed upon rent receipts, this suggested procedure being disapproved, however, by a representative of the Division of Housing. A further charge was that at a meeting of the Authority petitioner suggested a spiteful action. The final one, which the Authority itself minimized in its find-

ing, was that petitioner threatened and attempted to remove from his office files certain papers necessary to his defense. The Authority seems to have recognized that at least some of these charges were not serious or such as to warrant severe penalty, although its conclusions in these respects are not clear since two of the charges which it thus appraises are referred to by numbers which appear to be those of certain charges which were not sustained.

To review the measure of punishment imposed (Civ. Prac. Act, § 1296, subd. 5-a), we return to the two charges of unauthorized rentals which seem to us the crux of the case against petitioner and clearly are so regarded by the parties. The acts of dereliction charged and found were not of such inherent nature as to call for petitioner's dismissal upon the mere finding of their commission. (*Matter of Stolz* v. *Board of Regents,* 4 A D 2d 361; *Matter of Piper* v. *Lubin,* 4 A D 2d 812.) Consequently, they must be appraised in their factual setting and in that process great weight must be given the Authority's statements of the reasons and conclusions which prompted the punitive action taken.

The five members of the Authority, including the chairman, served without compensation and met monthly. In practice, the chairman seems to have exercised somewhat closer supervision of the two projects administered, visiting Saratoga Terrace weekly. Nevertheless, it is obvious that in the management of a project of this size, delegation of a considerable measure of authority upon petitioner as its manager was necessary. It was the chairman's testimony that she orally authorized petitioner to rent smaller apartments at his discretion but to obtain her approval of leases of three-bedroom apartments, this, apparently, to assure the granting of priority to tenants within the project who were in actual need of larger quarters. The leases in evidence are upon mimeographed forms prepared for execution by petitioner on behalf of the Authority. The chairman from time to time signed, in blank, certificates of approval of rental applications, sometimes as many as 15 at a time, which she left with petitioner. Under these somewhat loose arrangements and in view of the absence of clear and explicit definition of petitioner's powers by any official action of the Authority or the chairman, at least in any form to which recourse might be had as questions should arise, it is not surprising that errors should occur and conflicts ensue. That these might honestly, albeit mistakenly, arise may properly be considered in the evaluation of petitioner's conduct and good faith. Proper delegation of authority requires clear definition

of its extent and limitation, and that in such form as to minimize the likelihood of mistake and misunderstanding. Such definitive action is required in justice to both parties concerned and is essential to the proper performance of the duty imposed. The failure of the superior thus to formulate specifications should not unreasonably penalize the subordinate's honest though mistaken acts. In this case, petitioner, after consultation with a representative of the Division of Housing, had compiled a statement of duties which the Authority excluded from evidence. Although the statement might have been considered, if at all, only as bearing on petitioner's good faith in the performance of what he conceived his duties to be, the fact of its compilation points up the failure of the Authority to furnish instructions in such form as to be beyond dispute.

More important than these considerations, however, is the implication from this record that in determining the measure of punishment to be imposed the Authority was influenced by factors extrinsic to the issue of petitioner's misconduct or incompetency. The objection to the Macko and Hunt leases expressed by the chairman was that these persons were not in the category of overcrowded tenants within the project. Actually they were forced to obtain living quarters by reason of their impending eviction from a Webster Street building shortly to be demolished and the Authority declined to receive evidence that city authorities had urged petitioner to give consideration to these so-called hardship cases. Shortly after the Macko lease was made, Mr. Cunningham, another tenant of the Webster Street building, telephoned the chairman and asserted that his name had been on the waiting list at Saratoga Terrace for some time and he charged that the Authority had been moved by racial discrimination to ignore his application and accept that of his neighbor, Mr. Macko. Apparently, this charge became the subject of considerable publicity and discussion and the inference seems to us inescapable that this incident and the accompanying criticism of the Authority precipitated the proceeding for petitioner's removal and that these considerations are reflected in the punishment imposed.

In this connection, and incidentally as bearing somewhat upon the understanding as to the limitations of petitioner's authority, we find significant the chairman's letter of February 18, 1957 written to petitioner from New York City, stating: "Until such time as the present crisis with the Press has been resolved, the Authority rules that no further apartments be rented at Saratoga Terrace without prior approval of the Chairman."

The findings of the Authority further support the implication of extrinsic factors to which we have alluded. Although the record contains no evidence that petitioner's actions were at any time influenced by racial discrimination, and the Authority does not so contend, it was found that Mr. Cunningham "was led unjustly, but with apparent good reason, to charge the Authority with discriminating against him." It was found, further: "These actions and the publicity attending them were detrimental to and tended to undermine the effectiveness of the whole public housing program in the City of Binghamton." We find in the record no support whatsoever for this serious accusation and broad finding.

Implicit in the process of rightful delegation of authority is the continuing and coexisting responsibility of superior and subordinate. True delegation does not imply or justify the evasion of responsibility or the shifting of unpleasant consequences. If, as the Authority found, petitioner's acts were "aggravated" by accusations "unjustly" made, his proper punishment for the derelictions actually established may not be increased in proportion to the supposed aggravation of which he and the Authority were victims equally innocent. When imposing punishment it is, of course, proper and necessary to give consideration to those effects of the offense which may reasonably be deemed its natural consequences. Here, however, the unfortunate results stressed in the Authority's findings cannot be said to have flowed naturally from petitioner's acts or to have been reasonably foreseen and may not, therefore, constitute an additional basis for punishment.

The findings otherwise reflect some lack of objectivity, which was perhaps inevitable, though nonetheless unfortunate, in the situation where the chairman was the principal witness against petitioner and she and the other Authority members, of whom the hearing officer was one, necessarily passed on the credibility of her testimony in reaching their determination. Thus, the findings criticized as impertinent such of petitioner's defense as was "in some vaguely unflattering way" focused upon the chairman's efforts, which were then described with some laudation. Again, the hearing officer, who did not testify, in part predicated one recommended finding upon his personal recollection.

Without in any way detracting from the clearly apparent effort of the Authority to perform an unpleasant task in a fair and conscientious manner, we cannot escape the conclusion that the members were unwittingly influenced by the impact

of the public controversy, with the result that complete objectivity and perspective were lacking.

The consideration of punishment requires, also, that we note petitioner's previous record of service in the employment. He was appointed in 1950, qualifying by civil service examination and being first on the resulting list. He is a veteran of World Wars I and II, serving in the latter as an officer in military intelligence, and being credited with a service-incurred disability. So far as appears, he performed his duties without criticism for approximately seven years and in November, 1956, which was after certain of the acts of dereliction charged and shortly before the others, was included in the Authority's request to the State Division of Housing for approval of proposed increases in the salaries of all employees.

We are constrained to find that the penalty imposed was excessive and so disproportionate to the offenses found, whether these derelictions be considered singly or in their entirety, as to be '' shocking to one's sense of fairness '' (*Matter of Stolz* v. *Board of Regents,* 4 A D 2d 361, 364, *supra*). Its imposition, therefore, constituted an abuse of discretion. In our opinion, suspension without pay for the maximum period permitted by the statute would constitute adequate punishment.

Petitioner's conduct may be condoned to this extent only because of the unsatisfactory definition of his authority and the imposed penalty mitigated for that reason and because of the extraneous considerations which influenced its imposition. Petitioner must recognize that the delegation upon him of considerable authority of an executive nature implies responsibility in corresponding measure to perform the work in harmonious cooperation with his superiors. Failure in future in that respect, as the result of conduct found insubordinate within an area of responsibility defined with reasonable clarity, might well warrant dismissal.

The determination should be annulled, on the law and the facts and in the exercise of discretion, and the matter remitted to the Authority for further proceedings not inconsistent herewith, without costs.

Foster, P. J., Bergan, Coon and Halpern, JJ., concur.

Determination annulled, on the law and the facts and in the exercise of discretion, and the matter remitted to the Authority for further proceedings not inconsistent with the opinion herein, without costs.